IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| Belinda Kay Pence, Rosalind Lee, Stan Parker, Andrew Sansom and Mark Weiler, | § § § § | |
| Plaintiffs, | § § | |
| v. | § § | CASE NO. 1:20-cv-00088 |
| Permian Highway Pipeline, LLC, Kinder Morgan Texas Pipeline LLC, Kinder Morgan, Inc., EagleClaw Midstream Ventures, LLC, Altus Midstream Energy, and ExxonMobil Permian Highway Pipeline LLC, | § § § § § § § § | |
| Defendants. | § | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Belinda Kay Pence, Rosalind Lee, Stan Parker, Andrew Sansom, and Mark Weiler file this complaint against Defendants for violation of the Natural Gas Act, 15 U.S.C. §§ 717 *et seq.*, and Plaintiffs' rights as guaranteed by federal law.

**INTRODUCTION**

1.      This case arises out of Defendants' plan to build a natural gas pipeline (the Permian Highway Pipeline) through Plaintiffs' property in Gillespie, Travis and Blanco Counties.  Plaintiffs have either declined to voluntarily sell the necessary easement or right of way on their property, or sold them under threat of Defendants' use of the eminent domain provisions of Chapter 21 of the Texas Property Code.  However, Defendants lack legal authority to use the provisions of Chapter 21, because the Permian Highway

Pipeline is an interstate natural gas pipeline subject to the exclusive jurisdiction of the Natural Gas Act.

2.      Section 7(c) of the Natural Gas Act (15 U.S.C. § 717f(c)(1)(A)) forbids the construction or operation of any interstate gas pipeline without a certificate of public convenience and necessity ("Certificate") issued by the Federal Energy Regulatory Commission ("FERC"), and section 7(h) (15 U.S.C. § 717f(h)) limits the use of eminent domain for an interstate pipeline to Certificate holders.  Defendants do not hold, and have not applied for, a Certificate for the Permian Highway Pipeline, and may not legally construct, operate, or take Plaintiffs' property for purposes of constructing or operating the Permian Highway Pipeline.

3.      The Natural Gas Act, its implementing regulations, and FERC practices and procedures provide extensive procedural and substantive rights to landowners whose property is subject to eminent domain for interstate natural gas pipelines.

4.      By virtue of their use of Texas eminent domain authority, Defendants are state actors for purposes of 42 U.S.C. § 1983. By using, or attempting to use, Texas eminent domain authority to take Plaintiffs' property under color of state law, Defendants are depriving Plaintiffs of rights guaranteed by federal law.

**PARTIES**

5.      Plaintiff Belinda Kay Pence is the General Partner and holds a majority interest in CG Partners, which owns the property at 7535 FM 2093, Fredericksburg, TX 78624 in Gillespie County that Defendants seek to take by eminent domain. (The other interest in the partnership is held in trust for Ms. Pence's daughter.) Ms. Pence first learned of

Defendants' intentions when she received a phone call from Defendants' agent in or about August of 2018.

6.      Plaintiff Rosalind Lee owns an interest in the property at 1878 Schumann Road, Stonewall, TX 78671 in Gillespie County that Defendants seek to take by eminent domain. Ms. Lee first learned of Defendants' intentions when she received a phone call from Defendants' agent in August or September of 2018.

7.      Plaintiff Stan Parker owns the property in Gillespie County that Defendants seek to take by eminent domain.

8.      Plaintiff Andrew Sansom owns a life estate in the Hershey Ranch in Gillespie County that Defendants seek to take by eminent domain.

9.      Plaintiff Mark Weiler owns Tract No. TX-D-BL-698.310 in Blanco County, which is now encumbered by a "permanent easement and right of way" that he sold to Defendant Permian Highway Pipeline LLC while under threat of Defendants taking this permanent easement and right of way by eminent domain.  Mr. Weiler first learned of Defendants' intentions when he received a call from Defendants' agent in late October, 2018.

10.     Defendant Permian Highway Pipeline, LLC, is a Delaware limited liability corporation with its principal offices located at 1001 Louisiana Street, Suite 1000, Houston, Texas 77002.  Permian Highway Pipeline, LLC is identified in filings with the Railroad Commission of Texas as the "owner" of the Permian Highway Pipeline. Permian Highway Pipeline, LLC may be served through its registered agent Capitol Corporate Services, Inc. at 206 E. 9th St., Ste. 1300, Austin, TX 78701.

11.     Defendant Kinder Morgan Texas Pipeline, LLC is a Delaware limited liability corporation, with its principal offices located at 1001 Louisiana Street, Houston, Texas

77002.  KMTP is identified in filings with the Railroad Commission of Texas as the "operator" of the Permian Highway Pipeline.  KMTP owns 26.7% of Permian Highway Pipeline, LLC. KMTP may be served through its registered agent Corporation Service Company at 800 Brazos, Austin, Texas 78701.

12.     Defendant Kinder Morgan, Inc. is Delaware corporation with its principal offices at 1001 Louisiana Street, Houston, Texas 77002. On information and belief, Kinder Morgan owns a controlling interest in KMTP. Kinder Morgan may be served through its registered agent Capitol Corporate Services, Inc. at 206 E. 9th St., Ste. 1300, Austin, TX 78701.

13.     Defendant EagleClaw Midstream Ventures, LLC is a Delaware limited liability company has its principal offices located at 500 W. Illinois, Suite 700, Midland, TX 79701, and is a subsidiary of Blackstone Group, Inc.  EagleClaw owns 26.7% of Permian Highway Pipeline, LLC. EagleClaw may be served through its registered agent Todd Carpenter at 2700 Post Oak Blvd., Suite 300, Houston, TX 77056.

14.     Defendant Altus Midstream Company is a Delaware corporation with its principal offices located at One Post Oak Central, 2000 Post Oak Boulevard, Suite 100, Houston, TX, 77056. On information and belief, Apache Corporation owns a controlling interest in Altus Midstream. Altus Midstream owns 26.7% of Permian Highway Pipeline, LLC. Altus Midstream may be served through its registered agent CT Corporation System at 1999 Bryan St., Suite 900, Dallas, TX 75201.

15.     Defendant ExxonMobil Permian Highway Pipeline LLC is a Delaware corporation with its principal offices at 22777 Springwoods Village Parkway, Spring, Texas 77389, and is a subsidiary of Exxon Mobil, Inc. ExxonMobil PHP owns 20% of the Permian Highway Pipeline, LLC. ExxonMobil PHP may be served through its registered agent

4

Corporation Service Company dba CSC – Lawyers Incorporating Service Company at 211 E 7th St., Suite 620, Austin, TX 78701-3218.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction under 15 U.S.C. 717u, 28 U.S.C. 1331, 28 U.S.C. 1343(a), and 42 U.S.C. 1983.

17.     Venue is proper in this Court under 28 U.S.C. 1391(b)(2), insofar as a substantial part of the events giving rise to the claims occurred in this district, and all of the property that is the subject of this action is situated in this district.

## FACTS

The Permian Highway Pipeline

18.     On June 25, 2018, Kinder Morgan issued a Media Release stating that it had signed a letter of intent with EagleClaw and Apache Corporation for the development of the Permian Highway Pipeline ("PHP").  The Media Release also stated that, "Natural gas supply will be sourced into the PHP Project from multiple locations, including KMI's, EagleClaw's and Apache's existing systems in the Permian Basin, with additional interconnections to both intrastate and interstate pipeline systems in the Waha area."

19.     On August 10, 2018, KMTP announced an "Open Season", lasting until August 24, 2018, for natural gas shippers to bid for capacity on the PHP.  The Open Season notice stated that the PHP would "will offer firm intrastate and NGPA Firm 311 Transportation Service."

20.     "311 transportation service" refers to section 311(a)(2) of the Natural Gas Policy Act, 15 U.S.C. § 3371(a)(2), which provides that intrastate pipelines can transport gas on behalf of interstate pipelines. (FERC defines "firm" service as "service is not subject to a

prior claim by another customer or another class of service and receives the same priority as any other class of firm service." 18 CFR 284.7(a)(3).)

21.     Sept. 5, 2018, KMTP and EagleClaw announced "a final investment decision to proceed with the Permian Highway Pipeline Project (PHP Project), having executed definitive joint venture agreements and securing sufficient long-term binding transportation agreements with shippers. Subsequently, the partners secured such agreements for all of the remaining pipeline capacity."

22.     In January, 2019, ExxonMobil PHP acquired 20% of PHP.

23.     On May 29, 2019, Altus Midstream announced that it had acquired 26.7% of PHP, LLC.

<u>The Texas Railroad Commission's Permitting Process</u>

24.     Natural gas pipelines in Texas that are not subject to FERC jurisdiction under the Natural Gas Act are permitted by the Texas Railroad Commission, which requires them to apply for and obtain a "T-4" permit. The Railroad Commission's permitting procedure for natural gas pipelines is codified at 16 Tex. Admin. Code § 3.70 ("Pipeline Permits Required"), and requires T-4 applicants to submit only the following information:

> (1) the contact information for the individual who can respond to any questions concerning the pipeline's construction, operation or maintenance;
> (2) the requested classification and purpose of the pipeline or pipeline system as a common carrier, a gas utility or a private line;
> (3) a sworn statement from the pipeline applicant providing the operator's factual basis supporting the classification and purpose being sought for the pipeline, including, if applicable, an attestation to the applicant's knowledge of the eminent domain provisions in Texas Property Code, Chapter 21, and the Texas Landowner's Bill of Rights as published by the Office of the Attorney General of Texas; and
> (4) documentation to provide support for the classification and purpose being sought for the pipeline, if applicable; and
> (5) any other information requested by the Commission.

25.     After a pipeline company submits the 5-page, "check the box" T-4 application, the Railroad Commission performs purely ministerial functions with regard to the application, and then issues the permit. The Railroad Commission's hands-off process is best exemplified by the fact that it does not require the applicant to submit any information even regarding the applicant's ability to construct or operate such a pipeline, or whether it has the financial wherewithal to do so.

26.     Nor does the Railroad Commission provide any public notice of, or process for, T-4 permit applications, and imposes no restrictions on what route a T-4 permit applicant decides to take. A T-4 permit holder may build a pipeline wherever it wants and without any prior notice to local governments or landowners whose property the pipeline intends to take, and without any substantive government review whatsoever.   Nor does the Railroad Commission impose any conditions on the construction or operation of the pipeline to protect landowners' health, safety, or property.

<u>KMTP's T-4 Permit</u>

27.     Following the September 5, 2018 announcement of the "final investment decision", on or about October 8, 2018, Defendant KMTP submitted a "T-4 Permit Application", dated September 10, 2018, ("the Application") to the Railroad Commission.   The Application included a map which showed that PHP would run 423.95 miles from Pecos County to Colorado County.

28.     KMTP stated that it was a "Gas Utility", and checked a box saying that the gas it would carry would be "owned by others but transported for a fee."

29.    On October 22, 2018, the Railroad Commission issued KMTP a T-4 Permit to Operate a Pipeline in Texas (No. 09970) ("KMTP's Permit"); the entire substance of KMTP's Permit is a single sentence:

> This is to certify that KINDER MORGAN TEXAS PIPELINE LLC has complied with Railroad Commission rule 16 Tex. Admin. Code §3.70 governing pipelines in accordance with Texas Natural Resources Code, §81.051, and is granted this permit by the Commission to operate the following pipeline or pipelines located in the following county or counties:
>
> BLANCO, CALDWELL, COLORADO, CRANE, CROCKETT, FAYETTE, GILLESPIE, GONZALES, HAYS, KIMBLE, LAVACA, MENARD, PECOS, REAGAN, REEVES, SCHLEICHER, UPTON

30.    On or about November 27, 2018, KMTP submitted an amended T-4 permit application, requesting that the Railroad Commission, "update the Diameter to 42" for the entirety of the line." On December 3, 2018, the Railroad Commission issued KMTP an amended permit (with the same permit number).

FERC'S Permitting Process for Interstate Natural Gas Pipelines

31.    The Railroad Commission's permitting "process" stands in sharp contrast to the Federal Energy Regulatory Commission's permitting process for interstate natural gas pipelines.  The Natural Gas Act provides that FERC may grant a Certificate only:

> if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity.

15 U.S.C. § 717f(e). In order to make this determination, FERC has developed what is known as its "Certificate Policy Statement" (*Certification of New Interstate Natural Gas Pipeline Facilities*, 88 FERC ¶ 61,227 (1999), *order on clarification*, 90 FERC ¶ 61,128, *order on clarification*, 92 FERC ¶ 61,094 (2000).)  As FERC describes it:

> The Certificate Policy Statement provides guidance for evaluating proposals to certificate new pipeline construction. The Certificate Policy Statement establishes criteria for determining whether there is a need for a proposed project and whether the proposed project will serve the public interest. The Certificate Policy Statement explains that in deciding whether to authorize the construction of major new natural gas facilities, the Commission balances the public benefits against the potential adverse consequences. The Commission's goal is to give appropriate consideration to the enhancement of competitive transportation alternatives, the possibility of overbuilding, subsidization by existing customers, the applicant's responsibility for unsubscribed capacity, the avoidance of unnecessary disruptions of the environment, and the unneeded exercise of eminent domain in evaluating new pipeline construction.

*In re Trunkline Gas Company, LLC*, 153 FERC ¶ 61,300 (2015), p .48. FERC then describes the steps it takes in order to meet these aims, *i.e.*, "balance[] the public benefits against the potential adverse consequences", which include "the possibility of overbuilding" or "subsidization by existing customers", "unnecessary disruptions of the environment", and "the unneeded exercise of eminent domain":

> Under this policy, the threshold requirement for pipelines proposing new projects is that the pipeline must be prepared to financially support the project without relying on subsidization from its existing customers. The next step is to determine whether the applicant has made efforts to eliminate or minimize any adverse effects the project might have on the applicant's existing customers, existing pipelines in the market and their captive customers, or landowners and communities affected by the route of the new pipeline. If residual adverse effects on these interest groups are identified after efforts have been made to minimize them, the Commission will evaluate the project by balancing the evidence of public benefits to be achieved against the residual adverse effects. This is essentially an economic test. Only when the benefits outweigh the adverse effects on economic interests will the Commission proceed to complete the environmental analysis where other interests are considered. *Id.* at p. 49.

32.    Thus interstate natural gas pipeline companies may only take private property if they satisfy multiple criteria, including FERC's determinations that the pipeline can "financially support the project without relying on subsidization from its existing customers", and, of particular importance, that the pipeline "has made efforts to eliminate

or minimize any adverse effects the project might have on . . . *landowners and communities affected by the route of the new pipeline*" (emphasis added).

33.    To the extent that there are any remaining adverse effects on landowners (such as having property taken from unwilling sellers) or others, FERC must then determine that "the benefits outweigh the adverse effects on economic interests".

34.    Then, if any only if FERC is satisfied that the pipeline has satisfied all those criteria, does FERC proceed to examine the environmental effects of building a new pipeline, including those effects on landowners.  FERC's environmental process begins with its "prefiling" procedures under 18 CFR §157.21, which take place even before the pipeline submits its formal application to FERC; in fact, once it starts the pre-filing process, a pipeline company may not submit the actual application for 180 days. 18 CFR 157.21(e)(3).

35.    During the prefiling period, the pipeline company notifies all stakeholders, including local and state agencies, other federal agencies, and all the potentially affected property owners, about the project, for the purpose of allowing early public input into the project, including via open house meetings for all stakeholders.

36.    It is during the prefiling process that FERC publishes in the Federal Register a "Notice of Intent for Preparation of an Environmental Assessment or an Environmental Impact Statement under the National Environmental Policy Act" (40 CFR §1508.22), which starts the National Environmental Policy Act  ("NEPA") "scoping" process which seeks public and other agency input into the scope of the environmental review, including additional public meetings and site visits.

37.     When the pre-filing process is concluded, the pipeline company then develops a final application for submission to FERC.  A typical application for FERC approval of an interstate natural gas pipeline contains hundreds of pages of information about the pipeline.

38.     Once it receives the application, FERC issues a "Notice of Application". FERC's regulations (18 CFR 157.6(d)(3)) then require the pipeline company to provide the Notice of Application, along with other documentation, including, *inter alia*, such as "The most recent edition of the Commission's pamphlet that explains the Commission's certificate process and addresses the basic concerns of landowners"; "A description of the applicant and the proposed project, its location (including a general location map), its purpose, and the timing of the project"; "A general description of what the applicant will need from the landowner if the project is approved, and how the landowner may contact the applicant, including a local or toll-free phone number and a name of a specific person to contact who is knowledgeable about the project"; "A brief summary of what rights the landowner has at the Commission and in proceedings under the eminent domain rules of the relevant state"; "Information on how the landowner can get a copy of the application from the company or the location(s) where a copy of the application may be found"; and "A copy of the Commission's notice of application, specifically stating the date by which timely motions to intervene are due, together with the Commission's information sheet on how to intervene in Commission proceedings."

39.     FERC's regulations (18 CFR 157.6(2)) require that this information be sent to "all affected landowners and towns, communities, and local state and federal governments and agencies involved in the project", and define "affected landowners" to include,

"owners of property interests . . . crossed or used) by the proposed activity, including all facility sites (including compressor stations, well sites, and all above-ground facilities), rights of way, access roads, pipe and contractor yards, and temporary workspace;" property which, "Abuts either side of an existing right-of-way or facility site owned in fee by any utility company, or abuts the edge of a proposed facility site or right-of-way which runs along a property line in the area in which the facilities would be constructed, or contains a residence within 50 feet of the proposed construction work area"; and property which is "within one-half mile of proposed compressors or their enclosures".

40.     The application then goes through the NEPA process, which is described in FERC's "Guidance Manual for Environmental Report Preparation for Applications Filed Under the Natural Gas Act", and results in a draft Environmental Impact Statement ("EIS"). The draft EIS is then sent out for public comment, after which FERC reviews those comments and prepares the final EIS, which typically takes 6-12 months.

41.     A final EIS can run hundreds of pages with thousands of pages of supporting documentation; for example, FERC's most recent EIS for an interstate pipeline project (the Pacific Connector Pipeline) is more than a thousand pages long, and the appendices run to thousands of pages. Federal Energy Regulatory Commission, *Final Environmental Impact Statement for the Jordan Cove Energy* Project, Docket Nos. CP17-494-000 and CP17-495-000 (November, 2019)("JC EIS").

42.     The JC EIS illustrates in any number of ways the extent FERC's interstate natural gas pipeline process protects landowners. For example, the JC EIS includes (and are available to the public) the pipeline's Air, Dust and Noise Control Plan, Blasting Plan, Contaminated Substances Discovery Plan, Corrosion Control Plan;   Emergency

Response Plan; Erosion Control and Revegetation Plan; Integrated Pest Management Plan; Leave Tree Protection Plan; Safety and Security Management Plan; Sanitation and Waste Management Plan; Spill Prevention, Containment, and Countermeasures Plan; and Wetland and Waterbody Crossing Plan, each of which provides protections for landowners and their property. *Id*. 2-76 – 2-78.

43.     The JC EIS is typical in that it covers these and many other impacts to landowners' property, and contains extensive discussions of landowner issues such as "Soils and Sediments", "Water Resources and Wetlands", "Wildlife and Aquatic Resources", and "Air Quality and Noise".

44.     Just as to geologic issues, "the proposed route was evaluated for seismic, landslide, erosion and scour, and volcanic hazards that may potentially occur across or near" the pipeline route. JC FEIS 4-6. The pipeline company "selected the proposed route with input from agencies, stakeholders, and land managers/owners to avoid areas of high risk of geological hazards." *Id.* This public process resulted in the original route being "changed in multiple locations to avoid high hazard areas." *Id.*

45.     One of the issues of most concern to landowners on pipeline routes is the effect of construction (including blasting) and operation on their groundwater.  As a result, the pipeline will provide "site-specific Blasting Plans at least 5 working days prior to any proposed blasting-related activity" (*id.* 4-34); such plans include:

> • explosive type, product name and size, weight per unit, density, and equivalent energy
> release ratio (N) (the blasting agent Ammonium Nitrate and Fuel Oil [ANFO] would
> not be allowed);
> • delay type, sequence, and delay (milliseconds);
> • initiation method (detonating cord, blasting cap, or safety fuse);
> • stemming material and tamping method;
> • hole depth, diameter, and pattern;

13

• explosive depth, distribution, and maximum weight per delay;
• number of holes per delay;
distance and orientation to nearest aboveground structure;
• distance and orientation to nearest underground structure, including pipeline;
• procedures for storing, handling, transporting, loading, and firing explosives, fire prevention, inspections after each blast, misfires, fly rock and noise prevention, stray current accidental-detonation prevention, signs and flagmen, warning signals prior to each blast, notification prior to blasting, and disposal of waste blasting material;
• seismograph company, personnel, equipment, and sensor location, if required;
• copies of all required federal, state, and local permits;
• blaster's name, company, copy of license, and statement of qualifications;
• magazine type and locations for explosives and detonating caps; and
• typical rock type and geology structure (solid, layered, or fractured).

Id. 4-34-35.

Those are just the general blasting protections for landowners; there is a whole separate

set of protection for landowners' water supply. Procedurally:

Pacific Connector would request authorization from landowners to test and document the baseline condition, yield, and water quality of any private wells located within 200 feet of the   right-of-way. This testing would occur before the pipeline construction starts in the nearby area, and the testing results would be shared with the property owner, if requested. Similar information would be gathered for any public water wells located within 400 feet of the pipeline construction right-of-way. Based on testing results, if it is determined after construction that there has been an impact on groundwater supply (either yield or quality), Pacific Connector would work with the landowner to ensure a temporary supply of water, and, if determined necessary by the landowner, Pacific Connector would provide a permanent water supply. Mitigation measures would be coordinated with the individual landowner in order to meet the landowner's specific needs. Mitigation measures for groundwater wells, springs, and seeps would be specific to each property and would be determined during landowner negotiations. *Id.* 4-36.

Specific types of groundwater then get their own protections. For example, for landowners

with near-surface groundwater supplies:

Near-surface soil compaction caused by heavy construction vehicles could reduce a soil's ability to absorb water, which would affect infiltration/groundwater recharge rates and could affect underlying groundwater flow and quality. To reduce these impacts excavated topsoil and subsoils would be segregated within wetlands, agricultural areas, and at the request of landowners, and returned as closely as

14

> practical to their original soil horizon and slope position. Following construction, restoration of compacted soils would include regrading, recontouring, scarifying (or ripping), and final cleanup activities. Decompacting soils would restore water infiltration, reduce surface water runoff, reduce erosion, and support revegetation efforts. *Id.* at 4-82.

There are procedural and substantive protections for the above-ground consequences of blasting as well:

> Pre-blast inspections would be completed for structures and wells that are within the influence zone of the blasting. The pre-blast inspections would include but not be limited to an inventory structural integrity and signs of structural distress such as cracks. Post-blasting inspections would include an inspection and comparison of the same elements observed for the pre-blast inspection. If blast related damage is identified by Pacific Connector inspectors and confirmed to be a result of the blasting activities, then damaged structures or wells would be returned to pre-construction conditions or better. Id. at 4-35.

46.    By mislabeling the Permian Highway Pipeline as an "intrastate" pipeline, none of these – or the myriad of other – protections provided by the Natural Gas Act, FERC's regulations, or FERC's policies and procedures for landowners' health, safety, or property are available to the Plaintiffs or other landowners whose land Defendants want to take.

47.    As with all FERC pipeline Environmental Impact Statements, the JC EIS also covers issues such as "Land "Use", "Recreation and Visual Resources", "Socioeconomics", "Transportation", "Cultural Resources", and "Reliability and Safety". See also *Order Issuing Certificates and Granting Abandonment Authority*, Mountain Valley Pipeline LLC,  Docket No. CP16-10-000161, October 13, 2017, FERC ¶ 61,043, at P. 129 (In addition to environmental issues, the EIS for Mountain Valley Pipeline covered "land use, recreational areas, and visual resources; socioeconomic issues such as property values, environmental justice, tourism, and housing; cultural resources; air quality and noise impacts; safety; cumulative impacts; and alternatives.")

48.     As a result of this analysis, a pipeline EIS typically contains dozens of conditions governing the construction and operation of the pipeline, including numerous safety and environmental conditions specifically intended to protect landowners' property.

49.     After publication of the final EIS, by regulation FERC must then wait at least 30 days before it issues its Certificate decision; typically the time between final EIS and FERC's decision is several months.

50.     As a rule, FERC's certificates for interstate natural gas pipelines incorporate both the mitigation measures described in the pipeline's Environmental Impact Statement, and the recommended additional environmental conditions.  For example, in addition to all of the mitigation measures described in the project EIS, the Certificate for the Atlantic Coast Pipeline contains 73 such conditions, including requiring landowner approval for "route realignments or facility relocations"; weekly reports to FERC of "any landowner/resident complaints that may relate to compliance with the requirements of the Order, and the measures taken to satisfy their concerns"; an "environmental complaint resolution procedure [which] . . . shall provide landowners with clear and simple directions for identifying and resolving their environmental mitigation problems/concerns during construction", and which must be mailed to all landowners; requiring the pipeline company to offer post-construction water quality testing "for all water supply wells and springs within 150 feet of the construction workspace and within 500 feet of the construction workspace in karst terrain".

51.     FERC's administrative process for applying for, and then complying with, a Certificate of Public Convenience and Necessity provides an enormous incentive for

pipeline companies to avoid getting FERC's permission to build a pipeline in favor of, for example, the Texas process.

The Permian Highway Pipeline is an Interstate Pipeline

*Pipelines Supplying PHP*

52.     PHP's Open Season notice listed 11 "receipt points" that will supply gas to the PHP: EPNG, Enterprise, ETC TransPecos, Whitewater Agua Blanca, Oneok West Texas Pipeline, Oneok Roadrunner Pipeline, Northern Natural Gas, Atmos, ETC Oasis, Apache Alpine High Pipeline, and Eagle Claw Pipeline. In addition to those, on or about December 18, 2018, FERC issued a Notice of Intent to Prepare an Environmental Document for the Planned Double E Pipeline Project, Docket No. PF18-6-000, which noted that the Double E pipeline project would include a delivery meter "to serve Kinder Morgan's Permian Highway Pipeline."

53.     The PHP receipt points for Northern Natural Gas, EPNG (El Paso Natural Gas), and Double E are interstate pipelines, transporting interstate gas. Furthermore, EPNG is owned by Kinder Morgan.

54.     The PHP receipt points for Apache Alpine High, ETC Oasis, Oneok West Texas, OneOK Roadrunner, ETC TransPecos, Enterprise, and Whitewater Agua Blanca are each section 311 pipelines that transport interstate gas.

55.     On information and belief, the PHP receipt point for the "EagleClaw" pipeline is either an interstate pipeline or a 311 pipeline transporting interstate natural gas.

56.     Atmos Pipeline is the sole receipt point for PHP that is an intrastate pipeline transporting intrastate gas.

57.     Of the 12 receipt points, 11 are pipelines that transport interstate gas, and only one is an intrastate pipeline transporting intrastate gas.

*Pipelines Receiving Gas from PHP*

58.     The Open Season notice listed two types of "Delivery Points" for the PHP; "direct connects" to specific pipelines, and connections to pipelines in several "market areas". The PHP would have "direct connects" to KMTP, KM Tejas, HPL/KM JV, TETCO, TGP, Tres Palacios, and Oasis Prairie Lea.

59.     The connections in the "Katy Market Area" were identified as Katy Oasis Hub, Katy Enstor Hub, Katy Atmos Hub, and DCP Guadalupe; in the "Gulf Coast Market Area", the connections were to Trunkline, Gulf South, TGP, Transco, NGPL, TETCO, Coastal Bend Header, and EPD STX Market Area Pool; and in the "South Texas Market Area" the connections were to Cheniere Corpus Christi, NET Mexico, Enbridge Valley Crossing, Banquete Hub (Agua Dulce), Freeport LNG Train 3 lateral inlet, Southcross River Road, and KM Border Pipeline.

<u>The Seven Direct Connect Delivery Points</u>

60.     Of the seven "direct connect" pipelines receiving gas from PHP, ETC Oasis, KMTP, and KM Tejas are section 311 pipelines transporting interstate gas, and Tetco, Tennessee Gas, and Tres Palacios are interstate pipelines. On information and belief, the "HPL/KM JV" direct connect is either an interstate pipeline or a 311 pipeline transporting interstate gas.

61.     Four of the seven "direct connect" pipelines are owned, in whole or in part, by Kinder Morgan: KMTP, KM Tejas, Tennessee Gas, and, on information and belief, HPL/KM JV.

*The "Market Area" Delivery Points*

62.     The three "market area" delivery points included 19 specific delivery points.

63.     In the "Katy Market Area", the listed delivery points are the Katy Oasis Hub, Katy Enstor Hub, Katy Atmos Hub, and DCP Guadalupe.

64.     Katy Oasis Hub is owned by Oasis Pipeline, which in turn is owned by Energy Partners. On information and belief, Katy Oasis Hub stores and handles interstate gas.

65.     Katy Enstor Hub is owned by Enstor, and on information and belief stores and handles interstate gas. The Katy Enstor Hub itself connects to 14 different pipelines, at least five of which (KM Tejas, KM Tejas Mustang, KM Ship Channel, NGPL, and Tennessee Gas) are owned, in whole or in part, by Kinder Morgan.

66.     Katy Atmos Hub is owned by Atmos Energy – Texas. On information and belief, Katy Atmos Hub stores and handles interstate gas.

67.     DCP Guadalupe is a 311 pipeline transporting interstate gas, and is owned by Phillips 66, Spectra Energy, and DCP Midstream Partners, LP.

68.     In the "Gulf Coast Market Area" the listed delivery points are: Trunkline, Gulf South, TGP, Transco, NGPL, TETCO, Coastal Bend Header, and EPD STX Market Area Pool.

69.     "Trunkline" refers to an interstate pipeline system owned by Trunkline Gas Company, LLC, which in turn is owned by Energy Partners.

70.     "Gulf South" refers to an interstate pipeline system and storage facilities operates by Gulf South Pipeline Company, LP, which in turn is owned by Boardwalk Pipeline Partners.

71.     "TGP" refers to Tennessee Gas Pipeline, an interstate pipeline owned by Kinder Morgan.

72.     Transco is an interstate pipeline system owned by the Williams Companies, and is one of the largest pipeline systems in the U.S.

73.     "NGPL" is the Natural Gas Pipeline Company of America and is jointly owned by Kinder Morgan and Brookfield Infrastructure Partners L.P. NGPL is one of the largest interstate pipeline systems in the U.S.

74.     Tetco is an interstate pipeline owned by Texas Eastern Transmission, LP, a subsidiary of Enbridge Inc.

75.     Coastal Bend Header is a part of an interstate pipeline system, built to deliver natural gas to the Freeport LNG Development, L.P., a liquefaction terminal.

76.     On information and belief, EPD STX Market Area Pool are facilities that transport and store interstate gas.

77.     The delivery points in the "South Texas Market Area" are Cheniere Corpus Christi, NET Mexico, Enbridge Valley Crossing, Baquette Hub (Agua Dulce), Freeport LNG Train 3 lateral inlet, Southcross River Road and KM Border Pipeline.

78.     "Cheniere Corpus Christi" refers to Cheniere's LNG export facility in Corpus Christi.

79.     NET Mexico pipeline is a section 311 pipeline transporting interstate gas.

80.     Enbridge Valley Crossing is a section 311 pipeline transporting interstate gas.

81.     Baquette Hub (Agua Dulce) is a hub operated by NET Mexico Pipeline Partners.

82.     Freeport LNG Train 3 lateral inlet serves the Freeport LNG export facility.

83.     On information and belief, "Southcross River Road" refers to parts of the natural gas system operated at the time by Southcross Energy Partners and transporting interstate gas.  Following Southcross's bankruptcy, in November, 2019, KM Tejas, owned by Kinder Morgan, purchased a substantial portion of the Southcross pipeline system.

84.    KM Border Pipeline is a section 311 pipeline transporting interstate gas and is owned by Kinder Morgan.

85.    Four of the Market Area delivery points (Tennessee Gas, NGPL, Southcross, and KM Border) are owned, in whole or in part, by Kinder Morgan. In addition, Kinder Morgan owns, in whole or in part, five of the pipelines that connect with the Katy Enstor Hub delivery point.

86.    In sum, 11 of the 12 pipelines supplying the PHP transport interstate gas, all seven of the "direct connect" delivery pipelines receiving gas from PHP transport interstate gas, and all of the "market area" delivery points either store, handle, or transport interstate gas.

*The PHP is an Interstate Pipeline.*

87.    The Natural Gas Policy Act defines "interstate" and "intrastate" pipeline in an almost perfect tautology: an "interstate pipeline" as one "engaged in natural gas transportation subject to the jurisdiction of the Commission under the Natural Gas Act" (15 U.S.C. § 3301(15)) and an "intrastate pipeline" as one "engaged in natural gas transportation (not including gathering) which is not subject to the jurisdiction of the Commission under the Natural Gas Act (other than any such pipeline which is not subject to the jurisdiction of the Commission solely by reason of section 1(c) of the Natural Gas Act)." 15 U.S.C. § 3301(16).

88.    "Interstate gas" does not have to cross a state border to acquire that status.  If its destination is across a state line, it is "interstate gas" as soon as it enters the pipeline system.  And when intrastate gas is commingled with interstate gas, under the Natural Gas Act and Natural Gas Policy Act it is all considered interstate gas.

89.     As described in ¶¶ 24-51, above, before an "interstate" pipeline is built, it is subject to the criteria of the Natural Gas Act, FERC's rigorous, public, transparent, multi-year administrative process, and the mitigation conditions in its Certificate governing pipeline construction and operation, which are intended to provide landowners with extensive procedural and substantive protections for their health, safety and property. In Texas, an "intrastate" pipeline is subject to virtually no regulatory process at all, and Texas provides no such protections.   This difference provides an enormous incentive for pipeline companies to label a pipeline as "intrastate" even if it actually "interstate".

90.     As described in ¶¶ 52-86, above, the Permian Highway Pipeline will be supplied almost exclusively by pipelines transporting interstate gas, and will deliver to pipelines transporting interstate gas, because Defendants have always intended that PHP's real purpose would be to transport interstate gas as a section 311 pipeline. Only one of the twelve pipelines supplying the PHP (Atmos) is an intrastate pipeline, and to the extent that PHP carries any intrastate gas, on information and belief it will only be a *de minimis* amount shipped solely to create the pretext that PHP is "intrastate" as opposed to "interstate", and thus avoid FERC's regulatory process for approving interstate pipelines.

91.     As described in ¶¶ 52-86, above, defendants designed the PHP to integrate into their respective interstate gas systems. Specifically, Kinder Morgan owns one of the upstream pipelines, four of the seven "direct connect" downstream pipelines, and at least three of the Market Area downstream delivery points, and intends to operate the PHP as part of, and in support of, its interstate gas system.

### FIRST CAUSE OF ACTION
(Violation of 42 U.S.C. § 1983)

92.     Plaintiffs repeat and reallege paragraphs 1 - 91 as if fully incorporated herein.

93.     Section 7(c)(1)(A) of the Natural Gas Act, 15 U.S.C. § 717f(c)(1)(A), prohibits the construction or operation of an interstate natural gas pipeline without a certificate of public convenience and necessity from the Federal Energy Regulatory Commission.

94.     By claiming that the Permian Highway Pipeline is an intrastate natural gas pipeline, defendants have sought to avoid becoming subject to the Natural Gas Act, which provides Plaintiffs with numerous procedural and substantive protections for their health, safety, and property that are part of both the application process for a Certificate of Public Convenience and Necessity, and then the construction and operation of, an interstate natural gas pipeline pursuant to such a Certificate.

95.     By depriving Plaintiffs of these protections, Defendants have deprived Plaintiffs of rights guaranteed by federal law, in violation of 42 U.S.C. § 1983.

**SECOND CAUSE OF ACTION**
**(Violation of the Natural Gas Act)**

96.     Plaintiffs repeat and reallege paragraphs 1- 91 as if fully incorporated herein.

97.     Section 7(c)(1)(A) of the Natural Gas Act, 15 U.S.C. § 717f(c)(1)(A), prohibits the construction or operation of an interstate natural gas pipeline without a certificate of public convenience and necessity from the Federal Energy Regulatory Commission.

98.     Because the Permian Highway Pipeline is an interstate natural gas pipeline, its construction and operation violate section 7(c)(1)(A) of the Natural Gas Act, 15 U.S.C. § 717f(c)(1)(A).

**Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court:

        A)  Declare that the Permian Highway Pipeline is subject to the jurisdiction of the Federal Energy Regulatory Commission under the Natural Gas Act;

23

B)   Declare that Defendants are depriving Plaintiffs of their rights provided by the Natural Gas Act, FERC's regulations and FERC's practices and procedures;

C)  Declare that Defendants' construction of the Permian Highway Pipeline without a Certificate of Public Convenience and Necessity issued by FERC violates the Natural Gas Act;

D)  Declare that Defendants have no legal right to condemn property for the Permian Highway Pipeline unless and until it receives a Certificate of Public Convenience and Necessity pursuant to the Natural Gas Act;

E) Declare that property Defendants have already taken either by eminent domain or by threat of eminent domain was done so without legal authority;

F)   Enjoin Defendants from commencing or continuing condemnation actions against Plaintiffs or any other property owners unless and until FERC has issued the required Certificate of Public Convenience and Necessity;

G)   Enjoin Defendants from constructing and operating the Permian Highway Pipeline unless and until FERC has issued the required Certificate of Public convenience and Necessity;

H)  Award Plaintiffs their attorney's fees and expenses pursuant to 42 U.S.C. 1988; and

I)  Award such additional relief as may be just and proper.

Respectfully submitted,

/s/ Clark Richards
Clark Richards
State Bar No. 90001613
crichards@rrsfirm.com
RICHARDS RODRIGUEZ & SKEITH, LLP
816 Congress Ave, Suite 1200
Austin, Texas 78701
Tel: 512-476-0005


/s/David Bookbinder
Niskanen Center
820 First Street, NE
Suite 675
Washington, DC 20002
301-751-0611
dbookbinder@niskanencenter.org


January 24, 2020